UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

|  |  |  |
|---|---|---|
| JANE DOE,<br>    Plaintiff, | )<br>)<br>)<br>) |  |
| v. | )<br>) | C.A. No. 18-10-JJM-LDA |
| RHODE ISLAND SCHOOL OF<br>DESIGN,<br>    Defendant. | )<br>)<br>)<br>)<br>) |  |

MEMORANDUM AND ORDER

JOHN J. MCCONNELL, JR., Chief United States District Judge.

Jane Doe was sexually assaulted by John Doe ("John") in her bedroom during the first night of a study abroad program in Ireland organized by the Rhode Island School of Design ("RISD"). Ms. Doe now sues RISD, asserting negligence (Count I) and premises liability (Count II). ECF No. 19. RISD moves for summary judgment on each count. ECF No. 25.

For the reasons stated below, the Court DENIES RISD's Motion for Summary Judgment on Count I but GRANTS its Motion for Summary Judgment on Count II.

I. BACKGROUND

The facts relevant to deciding this Motion for Summary Judgment are undisputed.

At the start of its 2015-16 academic year, RISD, through its Continuing Education Office and Global Affairs Office, began planning a summer study abroad program in Ballyvaughan, Ireland (the "Ireland Program"). ECF No. 27-1 at 2, ¶¶9-

11. RISD identified the Burren College of Art ("Burren College") as its host school in Ballyvaughan. *Id.* at ¶¶11-14. Robert Brinkerhoff, a RISD Professor of Illustration, was the faculty advisor of the Ireland Program and chose Timothy Blaine-Kuklo, a student finishing a dual degree program at RISD and Brown University, to serve as his teaching assistant and resident assistant ("TA/RA"). *Id.* at ¶¶11, 14, 18. Among other responsibilities, Mr. Blaine-Kuklo was to be responsible for "[a]ssisting in the students' orientation to [their housing] accommodations" and with "health and safety requirements". ECF No. 33-26 at 1, ¶5.

As part of its planning process, RISD worked with Burren College to locate the housing that its students would stay in during their four weeks in Ballyvaughan. ECF No. 27-1 at 4-6, ¶¶19-31. RISD informed Burren College that it wanted all its students to be housed together along with Mr. Blaine-Kuklo. *Id.* at ¶20. RISD did not provide Burren College with any other expectations or requirements for the housing, including with respect to security. ECF No. 33-2 at 25-26, ¶¶180-81, 185-87. The RISD employees planning the Ireland Program, however, understood their role to include arranging safe housing for the students. *Id.* at ¶¶180-81.

Burren College initially recommended a large house near its campus, known as the "Lodge". ECF No. 27-1 at 4, ¶21. The Lodge, however, could not accommodate the fourteen RISD students participating in the program and Mr. Blaine-Kuklo. *Id.* at ¶24. As an alternative, the Burren College located housing in three adjacent houses with the Burren Atlantic Hotel and Holiday Village ("Burren Atlantic"), a local hotel owned by a private hotel property manager. *Id.* at ¶29; ECF No. 30-3 at 1.

2

RISD accepted these accommodations and memorialized its agreement with Burren College in a Group Study Abroad Agreement. ECF No. 27-1 at 6, ¶30. In advance of the program, Burren College invoiced RISD for the costs of the Ireland Program, including the student accommodations at the Burren Atlantic. *Id.* at ¶31. The costs for the student accommodations were included in each student's registration fee for the program. *See* ECF No. 33-29.

Prior to the start of the Ireland Program, Professor Brinkerhoff assigned housing for each of the fourteen RISD students and Mr. Blaine-Kuklo. ECF No. 27-1 at 9, ¶46. The assignments were made based upon each student's expressed preference to be in either a single or double bedroom. *Id.*

The Ireland Program began on June 18, 2016. *Id.* at ¶7. Professor Brinkerhoff and Mr. Blaine-Kuklo arrived in Ballyvaughan before the students. *Id.* at ¶¶52, 53. Upon arriving, they each met with Julia Long, Burren College's Group Study Abroad Coordinator. *Id.* at ¶¶52, 54. Ms. Long discussed the student housing with Professor Brinkerhoff and Mr. Blaine-Kuklo, including securing the exterior of the houses. *Id.* Each of the three houses had a lock to its exterior door with only one key to lock and unlock it. *Id.* at ¶54. Ms. Long informed Mr. Blaine-Kuklo that he and the students would need to decide on a hiding place for this key. ECF No. 33-2 at 13, ¶138. Whether the bedrooms had locks and keys was not discussed. *Id.* at 14, ¶139.

Ms. Doe and her fellow RISD students arrived in Ballyvaughan on June 18, 2016. ECF No. 27-1 at 11, ¶56. They were greeted at the Burren Atlantic by Professor Brinkerhoff and Mr. Blaine-Kuklo, who discussed with the students the need for a

3

hiding spot for the exterior keys. ECF No. 33-2 at 14-15, ¶¶145, 147. Ms. Doe and John were each assigned to a single bedroom on the second floor of the same house. ECF No. 27-1 at 9-11, ¶48, 60.

On the night of June 18, 2016, a group of students, including Ms. Doe and John, went out for drinks to celebrate their arrival and John's birthday. ECF No. 33-2 at 15, ¶151. Before midnight, Ms. Doe and John left together and John escorted Ms. Doe back to her room. *Id.* at ¶152. Prior to leaving her room, John asked Ms. Doe if she would kiss him. *Id.* at ¶154. Ms. Doe said she would kiss him on the cheek. *Id.* John left and Ms. Doe closed the door to her room and got into bed, wearing all her clothing. *Id.* at 16, ¶155. After sending text messages to a friend, Ms. Doe went to sleep. *Id.* at ¶156. Ms. Doe was unable to lock her bedroom, so the room remained unlocked while she slept. *See* ECF No. 27-1 at 11, ¶58.

Later in the night, Ms. Doe awoke to the feeling of someone on top of her. ECF No. 33-2 at 16, ¶157. Feeling paralyzed, she realized it was John and that she no longer had clothes on. *Id.* John raped Ms. Doe, orally and by vaginal penetration. *Id.* at 17, ¶158.

Ms. Doe reported the sexual assault to RISD. ECF No. 27-1 at 11, ¶61. She first reported it to Mr. Blaine-Kuklo, who, after discussing with Ms. Doe, reported it to RISD's Title IX Office. *Id.* at ¶¶61, 64. Ms. Doe subsequently submitted a formal complaint against John to RISD's Title IX Office and requested a no-contact order and his removal from the Ireland Program. *Id.* at 14, ¶74. John was dismissed from the Ireland Program the next day and ordered to leave. *Id.* at 15, ¶77. John accepted

4

responsibility for the sexual assault and was suspended by RISD for three years, with possible re-admittance for the Fall of 2019. *Id.* at 16, ¶84.

Prior to the Ireland Program, an allegation of sexual misconduct was reported to RISD during a 2013 study abroad program in Rome. ECF No. 33-2 at 1, ¶85. The student complainant alleged that another RISD student entered her room while she was sleeping and sexually assaulted her. *Id.* Following the report, an investigation was conducted under RISD's Code of Student Conduct. ECF No. 40 at 1, ¶85.

## II. STANDARD OF REVIEW

When making a summary judgment determination, the Court must review the entire record and consider the facts and inferences in the light most favorable to the non-moving party. *Cont'l Cas. Co. v. Canadian Univ. Ins. Co.*, 924 F.2d 370, 373 (1st Cir. 1991). Federal Rule of Procedure 56(a) dictates that summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A genuine dispute of material fact is an issue that "may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A dispute is "genuine" when "the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party." *Rivera-Muriente v. Agosto-Alicea*, 959 F.2d 349, 352 (1st Cir. 1992) (citing *United States v. One Parcel of Real Prop.*, 960 F.2d 200, 204 (1st Cir. 1992)). If there is a genuine dispute of a material fact, that dispute would "need[] to be resolved by a trier of fact." *Doe v. Trustees of Bos. Coll.*, 892 F.3d 67, 79 (1st Cir. 2018) (citing *Kelley v. LaForce*, 288 F.3d 1, 9 (1st Cir. 2002)).

5

III. DISCUSSION

   A. CHOICE OF LAW

Before delving into the substance, the Court must resolve the question of which law—Rhode Island or Ireland—applies to each of Ms. Doe's claims.[1]

Rhode Island courts do not follow the *lex loci delicti* conflict of laws doctrine and thus do not apply "the law of the jurisdiction where the injury occurred." *Blais v. Aetna Casualty & Sur. Co.*, 526 A.2d 854, 856 (R.I. 1987); *see also Harodite Ind., Inc. v. Warren Elec. Corp.*, 24 A.3d 514, 534 (R.I. 2011); *Cribb v. Augustyn*, 696 A.2d 285, 288 (R.I. 1997); *Woodward v. Stewart*, 243 A.2d 917 (R.I. 1968). Instead, the Court must conduct an interest-weighing approach, considering "the particular case facts and determin[ing] therefrom the rights and liabilities of the parties 'in accordance with the law of the state that bears the most significant relationship to the event and the parties.'" *Cribb*, 696 A.2d at 288 (citing *Pardey v. Boulevard Billiard Club*, 518 A.2d 1349, 1351 (R.I. 1986); *Putnam Res. v. Pateman*, 958 F.2d 448, 464 (1st Cir. 1992); *Blais*, 526 A.2d at 856–57; *Brown v. Church of the Holy Name of Jesus*, 252 A.2d 176, 176 (R.I. 1969). The interest-weighing approach for choice of law questions requires the court to consider: (1) predictability of results; (2) maintenance of interstate and international order; (3) simplification of the judicial

---

[1] The parties agree that Rhode Island law applies to Ms. Doe's negligence claim. RISD initially argued that Ireland law applied to Ms. Doe's premises liability claim (ECF No. 25-1 at 13) but, in its reply, seems to accept that Rhode Island law applies. ECF No. 39 at 8.

6

task; (4) advancement of the forum's governmental interests; and (5) application of the better rule of law. *Pardey*, 518 A.2d at 1351; *Woodward*, 243 A.2d at 923.

When analyzing choice of law for a tort, Rhode Island courts must also consider (1) the place where the injury occurred; (2) the place where the conduct causing the injury occurred; (3) the domicile, residence, nationality, place of incorporation and place of business of the parties; and (4) the place where the relationship, if any, between the parties is centered. *Carlson v. 84 Lumber Co.*, No. PC 09-3298, 2011 WL 1373508, at *1, *6-7 (Apr. 7, 2011).

After considering all the required factors, the Rhode Island Superior Court recently applied Rhode Island law to a tort that occurred in Bangladesh. *See Perella v. Gen. Council of Assemblies of God*, No. PC-2013- 6552, 2019 WL 1102906, at *1, 5 (Mar 1. 2019). In that case, the plaintiff, a resident of Rhode Island, sustained injuries in an automobile accident while on a mission trip and subsequently sued the Rhode Island church that planned the trip. *Id.* at *1. The parties disagreed on which law should apply in the case—Rhode Island or Bangladesh. *Id.* Determining that Rhode Island law should apply, the Superior Court noted that the place of the accident is only one of the factors to be weighed in the multiple factor analysis. *Id.* at *4. The fact that the plaintiff was domiciled in Rhode Island and that much of the planning and arrangements for the trip occurred in Rhode Island weighed in favor of applying Rhode Island law and suggested that the parties could reasonably expect that Rhode Island law would apply. *Id.* at *4-5. The Superior Court further noted

7

that applying Bangladeshi law would complicate the case, forcing the court and lawyers to obtain Bangladeshi law experts. *Id.* at *5.

Applying the general interest-weighing factors and the tort specific factors to both claims in the case, Rhode Island law bears the most significant relationship to the event and the parties. RISD is an educational institution organized and existing under Rhode Island law and Ms. Doe was a student who attended that university. ECF No. 27-1 at 1, ¶¶ 1, 3. Although the events giving rise to the claims occurred in Ireland, the soliciting, planning, and coordinating for the Ireland Program occurred in Rhode Island. *Id.* at 2, 6-7, ¶¶ 9-11, 33-40. It was thus reasonably foreseeable that Rhode Island law would apply in a dispute between the parties. Additionally, applying the unfamiliar law of Ireland could needlessly complicate the case. The Court will thus use Rhode Island law to analyze both claims.

### B. COUNT ONE: NEGLIGENCE

Ms. Doe alleges one count of negligence against RISD for failing to provide her with reasonably safe housing accommodations while participating in the Ireland Program. *See* ECF No. 19 at 6, ¶¶ 38-39. Her claim of negligence includes allegations based upon a theory of "negligent undertaking" as well as "negligent supervision". *See id.*

To prove negligence under Rhode Island law, Ms. Doe must establish that (1) RISD owed her a legally cognizable duty; (2) there was a breach of that duty; (3) there was proximate causation between the alleged conduct and the resulting injury; and (4) an actual loss or damages resulted. *See Daniels v. Fluette*, 64 A.3d 302, 304-05

8

(R.I. 2013); *Berard v. HCP, Inc.*, 64 A.3d 1215, 1218 (R.I. 2013) (citing *Holley v. Argonaut Holdings, Inc.*, 968 A.2d 271, 274 (R.I. 2009)). In its Motion for Summary Judgment, RISD asserts that it did not owe Ms. Doe a legally cognizable duty to protect against John's illegal acts. ECF No. 25-1 at 4-13. Ms. Doe's negligence claim, according to RISD, thus fails as a matter of law. *Id.*

The existence of a legal duty is a question of law that the Court is solely authorized to determine. *Volpe v. Gallagher*, 821 A.2d 699, 705 (R.I. 2003)). No "clear-cut formula" exists under Rhode Island law for making this determination. *Gushlaw v. Milner*, 42 A.3d 1245, 1256–57 (R.I. 2012). The Court must instead employ an ad hoc approach to deciding whether a duty exists, considering the following five factors:

> (1) the foreseeability of harm to the plaintiff, (2) the degree of certainty that the plaintiff suffered an injury, (3) the closeness of connection between the defendant's conduct and the injury suffered, (4) the policy of preventing future harm, and (5) the extent of the burden to the defendant and the consequences to the community for imposing a duty to exercise care with resulting liability for breach.

*Id.* (citing *Ferreira v. Strack*, 652 A.2d 965, 967–68 (R.I. 1995)).

The relationship between the parties is also relevant in a case, such as this, involving liability for the acts of a third party. *See id.* at 1256–57 (citing *Selwyn v. Ward*, 879 A.2d 882, 887 (R.I. 2005)). In such case, the Court must consider whether the relationship between the defendant and the third party or the defendant and the victim of the third party's conduct is a "special relationship" that warrants the imposition of a duty to control the conduct of the third party. *Id.* at 1257 (citing *Santana v. Rainbow Cleaners, Inc.*, 969 A.2d 653, 658 (R.I. 2009)); *see also Mu v.*

9

*Omni Hotels Mgmt. Corp.*, 882 F.3d 1, 6 (1st Cir.), *review denied*, 885 F.3d 52 (1st Cir. 2018). It is not entirely clear how the "relationship between the parties" interacts with the five previously listed factors. *See Mu*, 882 F.3d at 6. Some courts have treated finding a special relationship as a precondition to analyzing the other factors but that "hierarchy is not particularly clear" from the caselaw. *Id.* at n.3. Without determining whether finding a special relationship is a precondition to analyzing the five other factors, the Court will start with that analysis.

1. Special Relationship

"Under Rhode Island law, a special relationship, when derived from common law, is predicated on a plaintiff's reasonable expectations and reliance that a defendant will anticipate harmful acts of third persons and take appropriate measures to protect the plaintiff from harm." *Doe v. Brown Univ.*, 304 F. Supp. 3d 252, 261 (D.R.I. 2018) (citing *Martin v. Marciano*, 871 A.2d 911, 915 (R.I. 2005)). An example of such relationship is the relationship between those who provide intoxicants and those to whom they serve. *Martin*, 871 A.2d at 915 (citing 2 Stuart M. Speiser et al., *The American Law of Torts,* § 9:20 at 1125 (1985)). While not insurers of a guest's safety, courts have found a duty on barkeepers to exercise reasonable care to protect a guest from reasonably foreseeable injury at the hands of another patron. *See id.* This duty has been recognized due to the understanding that the overuse of intoxicants can excite tempers, emotions, and actions, creating a situation where an incidence of violence is more likely to occur. *See* Stuart M. Speiser et al., *2A The American Law of Torts,* § 9:20 at 1125 (2019).

10

While such relationship has most often been found in the context of serving alcohol—including a party host who allegedly made alcohol available to underage guests at her residence—special relationships have been found in other contexts as well. *Martin*, 871 A.2d at 915; *see e.g.*, *Volpe*, 821 A.2d at 709 (finding mother had duty to exercise reasonable care to prevent mentally ill son from intentionally harming others). In considering special relationships, the Rhode Island Supreme Court has cited to the Restatement (Second) Torts § 314A, titled "Special Relations Giving Rise to Duty to Aid or Protect," which lists legally recognized special relationships that give rise to a duty to take reasonable action to protect against unreasonable risk of physical harm. *See Martin*, 871 A.2d at 917. These relationships include (i) a common carrier, (ii) an innkeeper, (iii) a possessor of land holding its premises open to the public, and (iv) "one who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal opportunities for protection." Restatement (Second) of Torts § 314A (1999). As Comment e of the Restatement (Second) of Torts § 314A states "[t]he duty…is only one to exercise reasonable care under the circumstances."

The question of whether a special relationship exists between a university and the students participating on its study abroad program has yet to be considered under Rhode Island law. After reviewing the record, the Court considers this question "an interpretation of the common law", as opposed to "one of broad public policy". *See Ferreira*, 652 A.2d at 968. Despite other courts finding differently with respect to the typical university and student relationship, the Court makes this determination

11

because of the circumstances giving rise to this relationship between RISD and Ms. Doe. *See Furek v. Univ. of Delaware*, 594 A.2d 506, 519–20 (Del. 1991) ("The concept of university control based on the doctrine of *in loco parentis* has all but disappeared in the face of the realities of modern college life..."). In organizing the Ireland Program, RISD undertook to provide housing to Ms. Doe in a foreign country and Ms. Doe reasonably relied on RISD to act with due care. This undertaking and reliance altered the relationship between RISD and Ms. Doe to one that goes beyond the university and adult student relationship that led courts to abandon the doctrine of *in loco parentis*. *See id.*; *see also Gushlaw*, 42 A.3d at 1259.

In organizing the Ireland Program, RISD coordinated the housing arrangements with Burren College. ECF No. 27-1 at 4-5, ¶¶19-25. RISD required each student to stay in the selected housing; housing arrangements were part of the service RISD offered and were included in the tuition cost of the program. *See id.* In this coordination, RISD specifically requested that all its students be housed together. *Id.* at ¶25. Burren College located the housing at the Burren Atlantic that could fit all fourteen RISD students and RISD accepted these accommodations. *Id.* at ¶¶29-31. Prior to the start of the Ireland Program, RISD assigned each of its students to a room at the Burren Atlantic. *Id.* at ¶46. Other than submitting their preference for a single or double occupancy room, the students had no control or input on where they would be staying during their four weeks abroad. *See id.* So, while RISD was coordinating directly with the Burren College on housing for months, the students were excluded from that process.

12

Arranging the housing for the Ireland Program was an indispensable part of the service that RISD provided to its students. And RISD was compensated accordingly for this service by each student's tuition for the program. What puts RISD in a position to offer this service is its ability, as a large institution that offers multiple study abroad programs, to partner with foreign institutions like Burren College. These partnerships provide for access to world-class educational facilities and housing accommodations, even in remote villages like Ballyvaughan. RISD's position in this regard gives it an advantage that its students, such as Ms. Doe, are willing to pay for. But, in paying for this service, students reasonably rely on the university to exercise due care. *See Gushlaw*, 42 A.3d at 1259 (recognizing "that one who assumes a duty to perform an act must do so with reasonable care whether or not that person had an obligation to perform the act. . .prior to assuming the duty").

RISD further maintained a presence at the Burren Atlantic and made its employees responsible for the health and safety of the students staying at the hotel. Mr. Blaine-Kuklo, serving as the teaching assistant and resident advisor, was responsible for assisting "in the students' orientation to [their housing] accommodations" and with health and safety requirements. ECF No. 33-26 at 1, ¶5. To this end, Mr. Blaine-Kuklo was staying in a room in one of the three houses in which the students were staying and, prior to the arrival of the students, was briefed on the security. ECF No. 27-1 at 10, ¶¶54, 55. Mr. Blaine-Kuklo and Professor Brinkerhoff were the ones to greet the students when they first arrived at the Burren Atlantic and Mr. Blaine-Kuklo was the one to relay to the students that they needed

to find a shared hiding spot for the exterior house keys. ECF No. 33-2 at 13-15, ¶¶138, 145-147.

The Court finds that the relationship between RISD and Ms. Doe gave rise to a duty on the part of RISD to exercise reasonable care in providing secure housing to Ms. Doe for the Ireland Program. *See Martin*, 871 A.2d at 915–16. RISD undertook to arrange for housing for Ms. Doe in Ireland and Ms. Doe reasonably expected that RISD would exercise due care in fulfilling this undertaking. *See Gushlaw*, 42 A.3d at 1259. Whether RISD exercised such due care is a question of breach to be decided by a jury. *See Martin*, 871 A.2d at 917 (citing *Pollard v. Powers*, 738 N.E.2d 1144, 1144-46 (2000)).

In finding this special relationship, the Court is cognizant of the reluctance of other courts to find such a relationship between universities and their students. *See e.g.*, *Brown Univ.*, 304 F. Supp. 3d at 261; *Doe v. Emerson Coll.*, 153 F. Supp. 3d 506, 514 (D. Mass. 2015). Due to concerns of social implications, these courts have instead deferred to the legislature to make changes if warranted. *See Brown Univ.*, 304 F. Supp. 3d at 261. But the concerns that encouraged judicial restraint in those cases are missing under these facts.

In *Brown University*, the court dismissed a student's negligence claim after finding no special relationship existed between the university and the plaintiff, who sought to hold the university liable for negligently supervising a fraternity on its campus. 304 F. Supp. 3d at 261. The plaintiff in *Brown University* was allegedly drugged at a party held in the fraternity's on-campus house and later sexually

assaulted by another student. *Id.* In dismissing the negligence claim, the court concluded that "serious implications would attend holding universities . . . liable for the torts of their students . . .; any change in this area of third-party liability must come from the legislature." *Id.* While the Court agrees that summarily holding universities liable for the torts of their students would cause serious implications that would be better dealt with by the legislature, it does not see such concerns in this case. What distinguishes this case from *Brown University* is that the sexual assault occurred in Ms. Doe's bedroom, a bedroom that RISD, as part of its offering of a study abroad program, undertook to provide to Ms. Doe and that she was unable to lock. Ms. Doe was not attending an on-campus party for a few hours of socialization but instead was in what was supposed to be her RISD-provided sanctuary while abroad. In her most vulnerable moments—while asleep—she had only this room to rest. It was thus reasonable for her to expect RISD, in agreeing to provide the housing for the Ireland Program, would exercise due care. *See Gushlaw*, 42 A.3d at 1259; *see also Furek*, 594 A.2d at 519–20; *Mullins v. Pine Manor Coll.*, 389 Mass. 47, 51-54 (1983).

Due to this reasonable expectation, a finding of a special relationship between RISD and Ms. Doe is warranted. Contrary to what RISD asserts, the Court does not believe this finding will cause the unspecified "serious implications" that concern the university. Instead, this finding should serve only to confirm what RISD employees knew when planning the Ireland Program. That is, that in arranging study abroad programs for students that include housing arrangements, those students will expect

15

the university will provide reasonably safe accommodations. The RISD employees responsible for planning the Ireland Program stated that they believed RISD already had this duty, confirming that the imposition of this duty is already recognized in the university community. ECF No. 33-2 at 25-26, ¶¶ 180-81; *see Mullins*, 389 Mass. at 51.

### 2. Foreseeability of the Harm

Continuing with the ad hoc analysis, the Court considers foreseeability of the harm which "is the 'linchpin in determining the existence of any duty.'" *Mu*, 882 F.3d at 6 (citing *Splendorio v. Bilray Demolition Co.*, 682 A.2d 461, 466 (R.I. 1996)). "As it pertains to the determination of duty, the foreseeability inquiry considers generally whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed on the negligent party. *Martin*, 871 A.2d at 917 (citing *Banks v. Bowen's Landing Corp.*, 522 A.2d 1222, 1226-27 (R.I.1987)). "[T]he specific kind of harm need not be foreseeable as long as it was foreseeable that there would be harm from the act which constituted the negligence, provided it was foreseeable that there would be violence toward others." *Mu*, 882 F.3d at 6–7 (citing *Martin*, 871 A.2d at 917).

The Court finds that, in the context of determining a duty, it was reasonably foreseeable that one of RISD's students could be the victim of an attack if reasonably safe housing accommodations were not provided. When considering foreseeability with respect to the standard of conduct expected of those under a duty to protect others, the Rhode Island Supreme Court has looked to Comment e of the Restatement

(Second) Torts § 314A (1999), which provides that one who is under such a duty "is not required to take precautions against a sudden attack from a third person which he has no reason to anticipate." *See Martin*, 871 A.2d at 917. Instead "the requisite 'cause to anticipate' the assault may arise from (1) actual or constructive knowledge of the assailant's violent nature, or (2) actual or constructive knowledge that an atmosphere of violence exists in the [location of the assault]." *Id.* (citing *W.B. Crain v. Cleveland Lodge 1532, Order of Moose, Inc.*, 641 So.2d 1186, 1189 (Miss.1994)). RISD did not have actual or constructive knowledge of John's violent nature. But it did have constructive knowledge that an atmosphere of violence could exist in housing shared among university students. As the record makes clear, prior to the start of this program, RISD was aware that sexual assaults or misconduct could occur during its international study abroad programs. In fact, RISD, like so many universities, has had to deal with this reality, including with respect to an allegation of sexual misconduct during a study abroad program two years prior to the Ireland Program. ECF No. 33-2 at 1, ¶85; *see also Mullins*, 389 Mass. at 51 ("The concentration of young people, especially young women, on a college campus, creates favorable opportunities for criminal behavior. The threat of criminal acts of third parties to resident students is self-evident...").

While the Court finds it reasonably foreseeable that one of RISD's students could be the victim of an attack, a jury can still limit liability if it finds that the attack occurred despite RISD taking reasonable steps to provide for the safety of its students or if it finds John's actions constituted a supervening cause of harm. *See Martin*, 871

17

A.2d at 917. In such a case, there would be no breach and, consequently, there would be no negligence. *See Ferreira,* 652 A.2d at 967.

### 3. Remaining *Gushlaw* Factors

After finding a special relationship between RISD and Ms. Doe and the harm suffered by Ms. Doe as reasonably foreseeable, the Court also notes that none of the other *Gushlaw* factors weigh against finding RISD owed a legal duty to Ms. Doe. *See* 42 A.3d at 1256–57. First, it is undisputed that Ms. Doe suffered an injury. In addition, the injury occurred in the housing provided by RISD, closely connecting the injury to RISD's alleged negligent conduct. Further, the "policy of preventing future harm" to students participating on study abroad programs outweighs the burden to RISD and "the consequences to the community" that would result from imposing that duty. *See id.* at 1257. It is not burdensome to expect a university to exercise reasonable care when providing housing for its study abroad programs. In fact, if a university is going to endeavor to provide the housing for its study abroad programs, safety should be at the forefront of its considerations. As noted above, RISD employees planning the Ireland Program believed they had this obligation to their students, confirming that the imposition of this duty was already recognized. *See* ECF No. 33-2 at 25-26, ¶¶ 180-81.

### C. COUNT TWO: PREMISES LIABILITY

Count two of Ms. Doe's Complaint alleges premises liability against RISD for failing to protect Ms. Doe against a dangerous condition at the Burren Atlantic that it was aware of—the inability to lock the doors of individual rooms. *See* ECF No. 19

18

at 7-8, ¶¶40-48. Ms. Doe's claim of premises liability fails because RISD did not own, possess, or control Burren Atlantic. *See Lucier v. Impact Recreation, Ltd.*, 864 A.2d 635, 639 (R.I. 2005).

Premises liability under Rhode Island law is "[a] landowner's or landholder's tort liability for conditions or activities on the premises." *Lucier*, 864 A.2d at 639 (citing Black's Law Dictionary 1199 (7th ed. 1999)). To establish premises liability, a plaintiff must show that a defendant, who was the owner, possessor or in control of the premises, was aware or should have been aware of an unsafe condition that existed for a long enough time for the defendant to have taken steps to correct it. *Id.*; *see also Bromaghim v. Furney*, 808 A.2d 615, 617 (R.I. 2002) (citing *Barone v. Christmas Tree Shop*, 767 A.2d 66, 68 (R.I. 2002)).

RISD was not an owner, possessor, or in control of the Burren Atlantic. The Burren Atlantic is a private hotel that provides lodging to visitors staying in Ballyvaughan. *See* ECF No. 30-3 at 1. The visitors can stay for short stays, such as one night, or, like the participants in the Ireland Program, for an extended period. Regardless of the length of stay, the Burren Atlantic maintains the responsibility of the day to day running of its hotel. *See id.* at 1-2. Even for guest spending an extended period, the Burren Atlantic does not surrendered possession of its houses nor does the Burren Atlantic enter into a lease agreement assigning its obligation to maintain the premises. *See id.* Although RISD participants in the Ireland Program were the only guests staying in the three Burren Atlantic houses, their presence did

19

not equate to the controlling interest needed to hold RISD liable under Rhode Island premises liability law. *See Lucier*, 864 A.2d at 639.

## IV. CONCLUSION

For the reasons stated, the Court DENIES RISD's Motion for Summary Judgment on Count I but GRANTS its Motion for Summary Judgment on Count II. ECF No. 25.

IT IS SO ORDERED.

_____
John J. McConnell, Jr.
Chief United States District Judge

December 18, 2019