UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

JANE DOE,
    Plaintiff,

v().

RHODE ISLAND SCHOOL OF
DESIGN,
    Defendant.

C.A. No. 18-10-JJM-LDA

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND VERDICT AFTER A BENCH TRIAL

The Court conducted a bench trial, received the parties' proposed findings of fact and conclusions of law, heard closing arguments, and now renders its findings of fact, conclusions of law, and verdict under Fed. R. Civ. P. 52.

### I.  SUMMARY OF THE CASE

Jane Doe attended a Rhode Island School of Design ("RISD") sponsored three-week art program in Ireland. RISD provided the housing for the students. RISD did not investigate the safety or security of the rooms to which it assigned students. The houses were co-ed and contained four individual rooms. There were no workable locks on the bedroom doors. On the first night of the program, a fellow student walked into Jane's unlocked bedroom and raped her. She was raped as a direct and proximate result of RISD's failure to provide housing that was safe and secure and allowed her to lock her bedroom door. As a result, Jane has been permanently injured.

## II. FINDINGS OF FACT

### a. *The Program*

1. RISD, through its Continuing Education Department and its Global Office, offered a three-week summer program in 2016 in Ballyvaughan, Ireland entitled "Ireland: Illustrating Myths and Legends in the Burren" ("Ireland Program").

2. Jane Doe (a pseudonym used to protect the identity of a rape victim) was a student in a joint degree program at RISD and Brown University. She attended the Ireland Program having paid $5,375.00 to RISD to participate.

3. A RISD Professor proposed the Ireland Program to the RISD administration that approved the program. He was supposed to ensure the welfare and care of the RISD students participating in it. For it, he selected a recent graduate of the Brown/RISD dual degree program to serve as a Teacher's Assistant and Resident Advisor ("TA/RA").

4. RISD managed and controlled all aspects of the program including transportation, housing, and student safety.

### b. *The Housing*

5. RISD secured housing in Ireland for its students through its on-site partner, the Burren College of Art ("Burren"). Burren arranged for the RISD students to be housed at the Burren Atlantic Hotel and Holiday Village ("Burren Atlantic"). RISD did not require that the housing be safe when it contracted with Burren Atlantic. Because of the size of the RISD group, the students were assigned

2

four-bedroom "houses" at the Burren Atlantic. RISD made assignments for each student.

6. Each house had a key to lock the door to the outside. Yet every individual bedroom door could only be locked with a separate key. No one from RISD, the local sponsoring college, or the owner of the housing informed the students of the need for bedroom keys, nor where they could access them to lock their bedroom doors.

7. Before the Ireland Program began, RISD held a training session for students participating in its upcoming international programs, including the Ireland Program. It provided training on student conduct standards and behavioral requirements, including a presentation on the prevention of sexual misconduct and an instructional video on the mandatory requirement to obtain consent in all aspects of sexual interactions. RISD also held a pre-departure training session for the faculty advisors and TA/RAs addressing reporting obligations, health and safety concerns, leadership responsibilities, Title IX reporting and responding, and how to manage risks and incidents during international programs. During the training session, RISD reviewed with the faculty advisors and TA/RAs a chart titled "Faculty/Program Leader Incident Response," which delineated prescribed steps and measures to take when responding to a reported sexual assault or other incident that might arise.

8. Upon arriving in Ireland, no one from RISD investigated whether students could lock their bedrooms. No one asked anyone at Burren or Burren Atlantic if students would be given keys to their rooms to allow them to lock their individual bedroom doors.

9. The TA/RA did not receive any training about identifying safety issues in the student housing or inspecting the residences for security purposes.

10. As its standard procedure, the Burren Atlantic does not distribute any interior keys to the bedrooms in the houses.

11. All the bedroom doors in the housing where the RISD students stayed – including those in House-17, where Jane stayed – could lock but required a key. Burren Atlantic kept the House-17 bedroom door keys on the window ledge of the boiler room, but no one told Jane or any of the students.

### c. *RISD Officials Acknowledge Their Duty and Responsibility*

12. RISD officials acknowledged that RISD had a responsibility to do all that it could to provide safe housing to students participating in RISD off-campus programs, including providing students with keys to lock their bedrooms if needed.

13. RISD's Risk, Property, and Emergency Manager acknowledged that Jane's inability to lock her door put her at an increased risk of unauthorized intrusion during the Ireland Program. No one at RISD informed or warned Jane about this risk.

14. RISD established no policies related to the ability of students in RISD study abroad programs to lock their bedroom doors.

15. RISD's Lieutenant of Public Safety for Support Services acknowledged that RISD had a responsibility to provide its students with the ability to lock their bedroom doors. He professed that students had a reasonable expectation that RISD

4

would provide them with reasonably safe and secure housing, with secure buildings that limit access by strangers.

16. RISD could have and should have inspected the students' housing before they arrived. Moreover, RISD could have and should have conducted a risk assessment before allowing its students to reside in the houses used for the Ireland Program.

### d. *The Rape*

17. Jane and her fellow RISD students arrived in Ireland as participants in the Ireland Program on June 18, 2016. That evening a group of students, including Jane and the male RISD student who would later rape Jane in her bedroom ("Perpetrator"), headed into town for a celebratory drink.

18. Jane and the Perpetrator left the pub later that evening and walked back to their house. They both had bedrooms in the same house.

19. Jane and the Perpetrator went up to Jane's room where the Perpetrator requested a goodnight kiss from Jane, and Jane told him that she would kiss him only on the cheek. After giving the Perpetrator a kiss on the cheek, the Perpetrator asked for another kiss. Jane said "no" and showed him to the door.

20. After the Perpetrator left Jane's room, she closed her bedroom door. She tried but could not lock her bedroom door because the lock required a key, which neither RISD nor Burren Atlantic provided her.

21. She then got into bed and messaged her friend in the United States.

22. Sometime later, Jane awoke and felt a "heavy weight on top of" her. Jane recalls feeling like she "couldn't move" as she realized that the Perpetrator was on top of her. He smelled "like vomit and alcohol." Jane also realized that she no longer had on any clothing. He begged her to "just suck on it, please just suck on it a little." *See*, ECF No. 84 at 25–26.

23. The Perpetrator raped Jane in her bed. The Perpetrator used his mouth on her vagina and penetrated her with his penis. *Id.* at 26. Jane felt horrified.

24. Jane stared at the ceiling "feeling really profoundly sad." She felt like she was "hovering just below [her] body, sort of detached and unable to access" herself – "like being in a sunken place." *Id.*

25. Shortly after he left her room, Jane felt "agitated," "like [she] couldn't be in that room and couldn't be in the house" anymore. *Id.* at 27.

26. The next day, Jane approached the TA/RA and spoke to him privately. Jane told him that "something had happened" between the Perpetrator and her during the early morning hours and that she was not okay. *Id.* at 28. Jane was crying as she spoke to him. The TA/RA comforted her until she managed to speak about the incident.

27. RISD promptly arranged for Jane to receive medical care. The next day, the TA/RA accompanied Jane to a local medical center for an examination and a pharmacy to obtain medication. Jane had a "very distraught couple of days going to see doctors." *Id.* at 29.

28. By the end of that week, RISD dismissed the Perpetrator from the Ireland Program and ordered him to leave Ballyvaughan. After both an investigation and a hearing, RISD found that the Perpetrator had violated the RISD code of student conduct on sexual misconduct. There is no question that RISD responded appropriately to the rape, in both how they assisted Jane and how they adjudicated the situation. Janes described the TA/RA's response as "[o]verwhelmingly kind," noting that "[h]e was very concerned and very gentle and helpful." *Id.* at 85.

### e. *Prior Incident of Rape at a RISD Foreign Program*

29. In the summer of 2013, a RISD student reported being sexually assaulted in RISD housing while studying abroad in Rome, Italy as part of RISD's European Honors Program. The student housing was one building with a couple of floors. RISD housed students of all genders together and provided students with bedrooms that did not have workable locks on the doors.

30. RISD officials were aware of this sexual assault. The facts are strikingly like those surrounding Jane's assault less than three years later. RISD knew that students placed in mixed-gender housing were at increased risk of sexual assault, and how critical lockable bedroom doors might be for their safety and security.

### f. *Damage to Jane*

31. Jane's rape was a catastrophic event in her life. She suffered intensely at the time of the rape and during the immediate period that followed. Four years later, she still suffers from its negative consequences, and will continue to for the foreseeable future.

32. Right after the rape and for the next week, Jane "would vacillate between states of panic and . . . disbelief and . . . felt unable to . . . accept what was going on." She "felt completely dissociated from [her] body and like [she] was just powerless and really, really, really upset." *Id.* at 29–30.

33. Jane spent most of her initial time after the rape in bed, "in and out of sleep pretty much for the entire 24 hours." *Id.* at 34.

34. The rape "severely" impacted her time in the studio during the Ireland Program. Jane would spend "most of [her] time wandering the grounds." *Id.* at 31. Her artwork took a turn after the rape, becoming increasingly violent and disjointed as she struggled to concentrate and continue making art. *Id.* at 32.

35. Back at school, Jane was unable to complete the coursework for the additional academic concentration that she added after the Ireland Program. *Id.* at 40. Since the rape, her ability to concentrate has not been as good as it was before. *Id.* at 36 ("It's difficult for me to sort of maintain focus on certain tasks for a long time, and a lot of times I'll have trouble keeping energy up as well. So I'll get tired much more quickly and sort of have trouble applying myself, and it's had a big impact on my coursework.").

36. The rape hurt her relationship with her then boyfriend Brian. *Id.* at 34 ("It was really, really difficult, and it was something that we never really found a way to talk about. And I was struggling a lot, and it definitely was a contributing factor to things sort of crumbling. The communication between us was really, really difficult at that time and kind of forever after that.").

8

37. Jane suffers from chronic post-traumatic stress disorder ("PTSD") as a direct result of the rape. Her PTSD causes avoidance behaviors, as well as depression, fear, paranoia, agitation, and other negative emotions. The rape has created exceedingly difficult issues for Jane, leading to feelings of helplessness and depression.

38. The trauma from the rape has interfered with her ability to engage in some physical relationships, especially with men. *Id.* at 35. Jane does not want her father or brother to touch her and they no longer hug each other. *Id.* ("It's changed things pretty significantly. I feel discomfort definitely along the lines of physical touch. So, it's difficult for me to even hug some of my male family members. I still do, but I feel -- it's impossible for me not to be triggered and have sort of a really intense bodily reaction just to being in, like, close proximity. Even with, like, my dad and my brother, it's awful.").

39. Jane has a feeling of violation that never goes away. *Id.* ("[I]t's like the feeling of violation just sort of never, never goes away.").

40. Jane's PTSD symptoms interfere with future planning. Although Jane is extremely bright and creative, the rape has caused her to experience self-doubt and question her ability to function as an artist.

41. Jane has had periods of recurring nightmares that have to do with being pursued, trapped, or pinned down. Often it is an attempted rape. She calls out and screams in her sleep. She also struggles with flashbacks of the assault multiple times a week. *Id.* ("I have nightmares consistently. They usually have to do with being

9

pursued or trapped or pinned down. Quite often it's an attempted rape. It's gotten, I think, maybe a little bit better in that I only have nightmares a few times a month now; but when it's bad and when sort of things are flaring up, I'll have multiple nightmares a week and it's really difficult for me to shake the next day and difficult to get out of.").

42. The adverse impact on her life appears to be regular and permanent. *Id.* at 90–91 ("I would say now that it's four years in the past, I can -- I'll be happy maybe if I get like a day or two without it being really viscerally present in my mind; but it absolutely comes up for the most part every day . . .. [T]he intrusive thoughts are very difficult, especially with just repetitive tasks or even while I'm, like, nannying and cutting an apple or something. Suddenly it will come back, and it's very bodily."). The trauma from the rape comes up on a daily and weekly basis. *Id.* at 91 ("It definitely impacts my daily life on a daily and weekly basis.").

43. The rape will continue to cause Jane problems in her day-to-day functioning – affecting her relationships, forcing her to regularly cope with reminders, and surfacing trauma when she discusses the rape itself. Some of these symptoms may never go away.

44. Although Jane suffers on many levels from the trauma of rape, it does not mean that she is incapacitated and otherwise unable to enjoy many aspects of life. She is an accomplished scholar and artist who has graduated with honors from a dual degree program at Brown and RISD. During her collegiate days, she engaged in many extracurricular activities. Post-degree, Jane has enjoyed a deep, loving, and

10

committed relationship with someone she hopes will be her life partner. Jane has developed plans for her future, including applying for a Fulbright Scholarship to study in Iceland, potentially attending graduate school at Harvard Divinity School, and perhaps relocating to Mexico if her partner's visa is not renewed.

## III. CONCLUSIONS OF LAW

1. Under Rhode Island's choice-of-law analysis, Rhode Island law applies to Jane's claims. *See Doe v. R.I. Sch. of Design*, 432 F. Supp. 3d 35, 40 (D.R.I. 2019). The Supreme Court of Rhode Island has embraced the law of the jurisdiction with the most significant interest in the litigation. *Blais v. Aetna Cas. & Sur. Co.*, 526 A.2d 854, 856 (R.I. 1987).[1]

2. To prove the single count in the Complaint – negligence[2] – Jane must prove that (1) RISD owed her a legally cognizable duty; (2) there was a breach of that duty; (3) there was proximate causation between the alleged conduct and the resulting injury; and (4) actual loss or damages resulted. *Daniels v. Fluette*, 64 A.3d 302, 304–05 (R.I. 2013); *Berard v. HCP, Inc.*, 64 A.3d 1215, 1218 (R.I. 2013) (setting forth the elements a plaintiff must establish to prove negligence).

---

[1] "The parties agree that Rhode Island law applies to Ms. Doe's negligence claim." *Doe*, 432 F. Supp. 3d at 39 n.1.

[2] This Court previously dismissed the second count in the Complaint, which alleged premises liability. *Doe*, 432 F. Supp. 3d at 46 ("Although RISD participants in the Ireland Program were the only guests staying in the three Burren Atlantic houses, their presence did not equate to the controlling interest needed to hold RISD liable under Rhode Island premises liability law.").

### a. *Duty*

3. In an extensive review of the law, this Court had found that "the relationship between RISD and [Jane] gave rise to a duty on the part of RISD to exercise reasonable care in providing secure housing to [Jane] for the Ireland Program. RISD undertook to arrange for housing for [Jane] in Ireland and [Jane] reasonably expected that RISD would exercise due care in fulfilling this undertaking." *Doe*, 432 F. Supp. 3d at 43 (citations omitted).

4. The facts found by the Court after trial fully support this Court's decision in its summary judgment order that RISD owed a duty to Jane to provide reasonably safe and secure housing for her during its Ireland Program.

5. Moreover, almost all the RISD officials that testified at trial acknowledge that RISD had an obligation – a duty – to provide safe and secure housing to students studying in its overseas programs.

6. Finally, the fact that the same incident occurred three years earlier, resulting in the rape of another RISD student on a foreign program in RISD-supplied housing without locks on the bedroom door, increases the duty RISD owed its students.

### b. *Breach*

7. RISD's failure to provide Jane with housing that included a bedroom door that could be locked was a breach of the standard of care.

8.  Norman D. Bates, the president of a security management consulting firm that has provided such services for nearly 35 years,[3] testified that RISD failed to meet the standard of care in providing student housing for the 2016 Ireland Program. They did no due diligence – failing to inspect the site or ensure that the keys to the rooms were available for students to lock their doors and protect themselves. Despite knowing about the risks, RISD failed to mitigate them in any way.

9.  Mr. Bates testified that the failure to have lockable doors granted the Perpetrator "unfettered access" to Jane's room, allowing him to enter and sexually assault her on that night. Mr. Bates testified that it was "inherently obvious" that RISD's failure to provide lockable bedroom doors deprived Jane of the ability to protect herself from the assault. RISD offered no counter expert testimony.

10. The Court found Mr. Bates' testimony to be very credible. But even if the Court did not have expert testimony on the subject, the breach of duty by RISD was obvious to anyone.

11. Neither before the students' arrival in Ireland, nor once they arrived, did RISD take any steps to assess the security of the rooms. RISD did not inspect the accommodations for even basic security measures – like lockable doors.

---

[3] The Court qualified Mr. Bates as an expert witness without objection. "[E]xpert testimony is required to establish deviation from the standard of care when the lack of care is not so evident as to be obvious to a lay person." *Boccasile v. Cajun Music Ltd.*, 694 A.2d 686, 690 (R.I. 1997) (citing *Richardson v. Fuchs*, 523 A.2d 445, 450 (R.I. 1987)). While here the Court finds that the lack of care by RISD is obvious to a lay person, the expert's opinion supports that finding.

13

12. RISD trained none of the people involved in the Ireland Program on safety and security concerning the students' sleeping quarters.

13. RISD provided rooms to its students in the Ireland Program that they were unable to lock. The danger to Jane was foreseeable because a few years earlier, in nearly identical facts, a RISD student studying in a RISD program overseas was sexually assaulted in her bedroom because she could not lock the door.

### c. *Proximate Cause*

14. A negligence claim requires a finding of a standard of care, the breach of which caused the harm. *See Morales v. Town of Johnston*, 895 A.2d 721, 732 (R.I. 2006).

15. "In order to establish causation, a plaintiff must show that the defendant's breach of duty was the actual and legal cause of the plaintiff's harm." *Hall v. Eklof Marine Corp.*, 339 F. Supp. 2d 369, 376–77 (D.R.I. 2004); *Almonte v. Kurl*, 46 A.3d 1, 18 (R.I. 2012). To prove legal or proximate cause, "a plaintiff must demonstrate that the injury claimed was a direct or foreseeable result of the defendant's negligence. Under Rhode Island law, this requirement is satisfied if the injury is a 'natural and probable' consequence of the negligent act." *Doe v. United States*, 737 F. Supp. 155, 161 (D.R.I. 1990); *Hueston v. Narragansett Tennis Club, Inc.*, 502 A.2d 827, 830 (R.I. 1986).

16. The evidence is clear – if Jane had been able to lock her door, the Perpetrator could not have gained access to her room and then raped her. The rape was a direct and proximate result of the negligence of RISD and its officials.

### *d. Damages*

17. "As we have stated in prior decisions of this court, no particular formula or rule of thumb is available either to a jury or to this court for computing the damages which are due to a plaintiff for pain and suffering. The establishment of the amount to be awarded for pain and suffering has always been left to the discretion of the jury with proper instructions from the trial justice." *Worsley v. Corcelli*, 377 A.2d 215, 217–18 (R.I. 1977).

18. "It is not a prerequisite to an award of compensatory damages that there be evidence of a plaintiff's medical bills, amount of lost wages, or value of lost property presented to the court. Indeed we have stated that no mathematical formula exists for awarding a plaintiff damages for his or her pain and suffering, which is in the nature of compensatory damages." *Trainor v. Town of N. Kingstown*, 625 A.2d 1349, 1350 (R.I. 1993) (citing *Pimental v. Postoian,* 393 A.2d 1097, 1101 (R.I. 1978) and *Fusaro v. Naccarato,* 237 A.2d 545, 546 (R.I. 1968)).

19. To determine compensatory damages, this Court will follow the instructions it commonly provides juries, which state: "Any amount awarded for bodily injuries or pain and suffering should be based upon the consideration of the nature, extent, and duration of such injuries and such pain and suffering. In addition, you may compensate a plaintiff for mental suffering, which may include nervousness, anxiety, worry, shock, humiliation, embarrassment, or indignity." Mental suffering "may include nervousness, grief, anxiety, worry, shock, humiliation, embarrassment, or indignity. . .." *Arlan v. Cervini*, 478 A.2d 976, 980 (R.I. 1984).

20. Jane has been irreparably harmed because of RISD's failure to take reasonable steps to provide safe housing while she attended the Ireland Program. Because of the assault, Jane experienced both immediate and long-term intense negative responses to the trauma, as outlined above.

21. Jane's resilience in the face of unthinkable trauma does not dimmish the compelling evidence of her permanent damage. Here, evidence that Jane, after the rape, could complete various art projects, achieve "good" grades, apply for a Fulbright Scholarship, engage in interpersonal relationships, and the like, does not negate the damage to her that the rape caused. *See* ECF No. 84 at 90 ("I work hard. I really try to keep my suffering private. And definitely I've had a lot of issues sort of regaining any sense of ambition, but I do have things now that I look forward to. And so that's definitely some hard battles that were won to get there."). "[T]he law is always concerned that an injured party shall be fully compensated for whatever injury [she] may have sustained." *DeSpirito v. Bristol County Water Co.*, 102 R.I. 50, 53–54 (1967).

22. Fortunately, Jane is hopeful for the future. ECF No. 84 at 37. ("Q. Are you hopeful for the future? A. I try to be. Some days are easier than others. So I try to keep a good outlook, but I think in times when sort of memory -- like, memories of trauma come up, it can be really difficult to shake off and get out of that sort of base of hopelessness and despair, but I try. I try.").

23. Jane has shown compelling evidence of the immediate trauma she experienced the night of her rape, as well as her continued, ongoing, and permanent injuries because of it.

## IV. VERDICT AND AWARD

After considering the nature, extent, and duration of Jane's injuries, the Court awards Plaintiff Jane Doe two million, five hundred thousand dollars in compensatory damages, plus interest and costs. Judgment to enter for the Plaintiff.

IT IS SO ORDERED.

_____
John J. McConnell, Jr.
Chief United States District Judge

February 2, 2021